UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

TODD LEEK,

          Petitioner,

             v.                            CAUSE NO. 3:20-CV-790-JD-MGG

WARDEN,

          Respondent.

## OPINION AND ORDER

Todd Leek, a prisoner without a lawyer, filed a habeas corpus petition under 28 U.S.C. § 2254 to challenge his conviction for child molestation under Case No. 02D04-1402-FA-11. Following a jury trial, on January 30, 2015, the Allen Superior Court sentenced him to eighty years of incarceration.

## BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> The facts favorable to the judgment are that Leek met J.J. in 2003 and they married in 2004. J.J. had five children, including B.L., who was four years old at the time. Leek adopted all five children. The family moved often during the next few years, sometimes in order to avoid investigation of physical abuse of one of the daughters. Leek was verbally and physically abusive toward J.J. When B.L was between five and eight Leek began inappropriately touching her sexually, and the inappropriate activity progressed over the next several years. B.L. did not immediately report the activity because she was afraid of Leek.

> In May 2013, J.J. and the children moved out. Shortly afterward B.L. described to her mother the inappropriate touching by Leek. B.L had made similar allegations once before, while the family was traveling. After the 2013 allegations an investigation was initiated, and in 2014 Leek was charged and convicted.

ECF 14-7 at 2; *Leek v. State*, 44 N.E.3d 136 (Ind. App. 2015).

Leek asserts that he is entitled to habeas relief because he received an excessive sentence and because trial counsel provided ineffective assistance by failing to object to evidence regarding the family's frequent moves at trial under Ind. R. Evid. 404(b), by failing to investigate, by failing to inform the jury of his former spouse's citizenship, by failing to present expert testimony, by failing to object to testimony regarding the family's frequent moves as impermissible drumbeat repetition, and by failing to object to the prosecution's motion in limine. Leek further asserts that he is entitled to habeas relief due to ineffective assistance of post-conviction counsel. Because there is no constitutional right to post-conviction proceedings, the claims of ineffective assistance of post-conviction counsel do not present cognizable grounds for habeas relief. *See Flores-Ramirez v. Foster*, 811 F.3d 861, 866 (7th Cir. 2016) ("It is well established that the Constitution does not guarantee any postconviction process, much less specific rights during a postconviction hearing.").

<u>PROCEDURAL DEFAULT</u>

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts.

*Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

On direct review, Leek presented his claim regarding his sentence to the Indiana Court of Appeals and the Indiana Supreme Court. ECF 14-5; ECF 14-8. On post-conviction review, Leek presented only the ineffective assistance claims related to trial counsel's failure to object to the evidence of the family's frequent moves to the Indiana Court of Appeals and the Indiana Supreme Court. ECF 14-13; ECF 14-17. Therefore, the other ineffective assistance of trial counsel claims are procedurally defaulted, and Leek offers no basis to excuse the procedural default.

<u>STANDARD OF REVIEW</u>

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

4

To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

DISCUSSION

<u>Ineffective Assistance of Trial Counsel</u>

Leek argues that he is entitled to habeas relief because trial counsel failed to object to evidence regarding the family's frequent moves at trial under Ind. R. Evid. 404(b) or as impermissible drumbeat repetition. The Indiana Rules of Evidence provide:

**Crimes, Wrongs, or Other Acts.**

(1)     Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

5

(2)      Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

(A)      provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

(B)      do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

Ind. R. Evid. 404(b).

Further, Indiana law prohibits the repeated use of out-of-court statements even when they are admitted for a non-hearsay purpose:

One danger of prejudice arises in the "drumbeat repetition" of an out-of-court assertion. Indeed, in light of a proffered non-hearsay purpose, exclusion might not be warranted where there is a mere isolated reference to an assertion. However, as additional testimony about the assertion "beats the drum," there is increasing danger the jury will use the testimony for an improper purpose. For example, the jury might use the testimony as proof of the matter asserted. Or, the jury could treat the repetitive testimony as a form of vouching for the credibility of the declarant. As to the latter risk, this type of problematic vouching is not the blatant type prohibited by Evidence Rule 704(b)—where a witness directly opines about "the truth or falsity of allegations" or "whether a witness has testified truthfully." Rather, the risk is insidious. That is, the repeated references might eventually inundate the jury, leading them toward an inference that witnesses are vouching for the credibility of the declarant.

*Kress v. State*, 133 N.E.3d 742, 747 (Ind. App. 2019).

Prior to trial, the prosecution filed a Second Amended Notice of Intent to Use 404(b) Evidence relating to "a pattern of changing residences when law enforcement or the Department of Family and Children becomes involved with the Defendant, the victim, or other members of their family," including:

6

- On December 20, 2010, the victim's older sister reported to law enforcement in Elkhart County that Leek physically abused her. Law enforcement initiated an investigation, and the older sister recanted. The family moved out of Elkhart County within days.

- On April 15, 2011, the victim's older sister reported to a youth pastor in LaPorte County that Leek physically and sexually abused her and solicited nude photographs of her. Four days later, the family moved out of LaPorte County.

- On May 24, 2012, the victim's older sister reported in Suwannee County, Florida, that Leek had physically and sexually abused her. The family left the state where the older sister remained in foster care during the course of the investigation.

Direct Appeal App. 47-80. The prosecution explained that the evidence was necessary to explain why the victim did not disclose Leek's sexual abuse toward her on certain occasions; she had observed that reporting abuse did not stop the abuse but resulted only in another move and eventual removal from the family. *Id.* The prosecution also asserted that the evidence would illustrate the nature of the relationship between the parties, the victim's state of mind, and Leek's consciousness of guilt. *Id.*

At a hearing on May 22, 2014, trial counsel opposed the admission of this evidence on the basis that the prosecution's alleged intended uses did not fall under any of the permissible uses listed by the Ind. R. Evid. 404(b) and that it was unfairly prejudicial. Transcript of Pretrial Hearing on May 22, 2014. Trial counsel also argued the prosecution intended to use the evidence to demonstrate Leek's propensity to sexually abuse the victim. *Id.* At another hearing, on October 17, 2014, trial counsel opposed the admission of the evidence on the

basis that it was unfairly prejudicial as it resembled propensity evidence and relied on uncharged and unfounded accusations that were later recanted. Transcript of Pretrial Hearing on October 17, 2014. She also opposed it on the basis of relevance, noting a lack of evidence showing that Leek was aware of the investigations, that Leek's risk of criminal liability motivated the moves, or that the victim was aware of her older sister's conduct. *Id.* The trial court overruled trial counsel's objection. Direct Appeal App. 80.

During opening statement at trial, trial counsel asserted the evidence would show that Leek served as the primary disciplinarian for the family and that the victim and her older sister would report him to legal authorities in order to control him. Trial Tr. 28-32. Trial counsel also implied that the victim and her sister were not credible due to the inconsistent nature of their allegations against Leek. *Id.*

The prosecution's first five witnesses consisted of the victim's older sister, the victim's mother, the youth pastor and a detective from LaPorte County, and a police officer from Elkhart County. *Id.* at 22- 175. Each of these witnesses testified about their role in the older sister's reports that Leek had abused her and the family's corresponding moves. *Id.* With respect to the victim, the older sister testified that Leek would offer them rewards for dancing or displaying

themselves in revealing clothing and that they accepted these offers from Leek.[1]
*Id.* at 33-57. She testified that Leek and the victim were frequently in Leek's
bedroom when the mother would go shopping and that Leek demonstrated
favoritism toward the victim by giving her more gifts than he gave the other
children. *Id.* Leek had purchased the victim and the older sister similar pairs of
thong underwear. *Id.*

The mother testified that the victim reported the sexual abuse to her in
April or May 2013 after the family had moved to Michigan without Leek. *Id.* at
92-127. The victim had also reported the sexual abuse to her one previous
occasion as they were traveling through California. *Id.* When the mother
confronted Leek, he first accused her of lying but then apologized and promised
that he would not do it again. *Id.* She told the victim to give her time to come up
with a plan but did not call the police or family services. *Id.* She observed that the
victim possessed a pair of underwear that was inappropriate for her age and
money that she did not give her. *Id.* The mother also observed oil residue in her
bathtub of the master bathroom, which the children were not allowed to use, and
that Leek explained that the victim had used oil while taking a bath in the master
bathroom. *Id.*

---

[1] Though the focus of the claim is on the evidence relating to the older sister's reports of abuse
and the corresponding family moves, the court recounts the evidence at trial in full in order to better
assess the State court's determination on the prejudice prong of the *Strickland* analysis.

The prosecution also introduced an audio recording of a conversation between Leek and the mother after the victim had reported sexual abuse to her in April or May 2013. *Id.* at 125-27. The audio recording was of low quality, and the prosecution offered the jury a transcript of the conversation as an aid. *Id.*; Trial Ex. 5.

**Leek:** I couldn't live with myself after it all occurred. I had to get away.

**Mother:** You said that. You said all that stuff then, it didn't.

**Leek:** Yeah. Yeah, pretty much.

**Mother:** It didn't. No, no, no, not pretty much. It didn't.

**Leek:** Ok, pretty much. But I had to get out. I had to get a job. It was too much for me to be in that house.

**Mother:** You promised me.

**Leek:** Babe, it was too much. I had to live up to my standards.

**Mother:** That's why we've had no sex life for two months?

**Leek:** No that's not it. That is not it. I swear that has nothing to do with it. The connection there is not the same. I don't replace a thirteen-year-old with my wife. You, on the other hand, when we don't get along. Everything. It's been what, two months?

**Mother:** Yup.

**Leek:** Ok. So what's the excuse there? I haven't been around [the victim] in that long. At least.

**Mother:** It's only been a week or two since you haven't seen us.

**Leek:** Ok. Not a week or two. It's been more like almost three.

**Mother:** Since when? Since you left the house?

**Leek:** It doesn't matter. The sex wasn't there, and I wasn't. Yeah. Since yeah, moved out of the house.

**Mother:** You left the house two weeks ago.

**Leek:** I moved out.

**Mother:** Two week ago! That's it.

**Leek:** It seems more like three.

**Mother:** No.

**Leek:** Well, two months of fighting.

**Mother:** There hasn't been no sex in two months.

**Leek:** Yeah ok.

**Mother:** But moving out's only been two weeks.

**Leek:** No sex with [the victim] either so what's the difference?

**Mother:** You promised me, you promised.

**Leek:** Honey, honey, it's not like I'm . . .

**Mother:** You don't understand ok. I told you. I warned you. I told you.

**Leek:** I'm not into it. I'm not even watching any porno here. I'm good and I'm . . .

**Mother:** I've heard this before.

* * *

**Mother:** I can't, I can't. I trusted you. You promised me.

**Leek:** I gotta make her promises.

**Mother:** By making, what bigger promises do you have?

**Leek:** God.

11

**Mother:** But to me, you promised.

**Leek:** Of course. I don't want to hurt anyone.

**Mother:** Every time I went to Kim something went on?

**Leek:** I don't want to hurt anybody. No. Don't be generalizing everything.

**Mother:** Did you have sex?

**Leek:** No, [the victim] . . . no. I had no sex.

**Mother:** Did you put your something in her?

**Leek:** No. No I didn't put it in her. Okay stop it.

* * *

**Mother:** We've got a problem here you know? I can't swallow this.

**Leek:** I can't swallow what [the victim's] given out either.

**Mother:** Why? You promised me that, you know.

**Leek:** Babe, I wasn't molesting her, just . . .

**Mother:** What the hell are you doing with her then? Tell me.

**Leek:** I'm her step-dad that's for sure. She knows that. I keep trying to talk to her and she won't listen to me. I mean sometimes I yell at her and she's like, I'm telling mom. It's like, well she's got something over on me because if she comes up with something and tells you then I can't tell her what to do. I'm blackmailed. So she knows she's got leverage over me. It's gotten to a point where if I get mad, and Jacob and her are fighting or something, and I break it up, and I'm picking on her because I know she's the instigator, it's her fault and I tell her to back off and I'm directing my yelling at her, she gives me that look, like you know, I can get you in trouble. So it was getting bad to where she wouldn't listen to me after a while.

**Mother:** So what have you guys been doing?

**Leek:** Nothing. You know it's not even. It's . . .

**Mother:** Tell me.

**Leek:** Why? To entertain you?

**Mother:** I want to know.

**Leek:** Nothing.

**Mother:** Did you have sex?

**Leek:** No, Marie.[2] Come on. That's getting over the line.

**Mother:** I don't know. Did she suck your penis?

**Leek:** No.

**Mother:** What did she do then?

**Leek:** She just grabbed it not even a couple times. She thinks she wants to play or something. Like the old days where you know I give her lectures and tell her, you know, it's not a Christian thing all that talk and pure everywhere, not just . . . I'm not insinuating anything. No rape, no sex, it's just talk about purity like, this stuff is something. I'm weak, yeah, and she's got a hold of me. She's gotta be, you know as pure, purer than me. She's a girl. She's supposed to save herself. I gave her those talks, you know.

**Mother:** So what, she was encouraging and liked it too?

**Leek:** Well, I don't want to get her in trouble. I don't want to make her look like the bad guy because I'm the one that started this bullshit. It wasn't like she was being violated.

**Mother:** Does she ever get naked?

**Leek:** I don't know. In the bathroom once or twice. That might have occurred, yeah.

**Mother:** In Fort Wayne?

---

[2] Leek refers to the victim's mother by her middle name, Marie.

**Leek:** I don't remember.

**Mother:** She said she was sitting on top of you naked.

**Leek:** No. I thought she was better than [her older sister]. I mean, [her older sister] didn't have shit on me. Nothing. Except she thought I was insinuating something. Right? I mean [the older sister] didn't have shit on me. She just knew I had a problem with that are so she knew that I was a good . . .

**Mother:** How do you know [the victim's] not pregnant though?

**Leek:** She's not pregnant. I'm not. We went over this.

**Mother:** But your stuff could go in her.

**Leek:** We went over this. No stuff got near her.

**Mother:** Did stuff ever come out?

**Leek:** On me? Yeah.

**Mother:** Gosh.

**Leek:** My pants. Nothing ever got near her.

**Mother:** You can't have normal sex with me, but you can have normal sex with other people?

**Leek:** Oh, Marie.

**Mother:** It makes no sense, I really don't understand.

*Id.* At trial, the mother testified that the promise referenced in the recorded conversation was Leek's promise to her that nothing was going on between him and the victim and that he was not hurting the victim. Trial Tr. 158-59.

The victim testified that Leek began sexually abusing her when she was seven or eight years old. *Id.* at 176-204. He began by taking her to her bed and

14

touching her crotch with his hand underneath the bedsheets. *Id.* He continued this behavior on a regular basis as the family moved from location to location. *Id.* She tried to report the sexual abuse at school, but the teacher told her that she was busy. *Id.* Leek asked her to perform the sexual acts portrayed in pornography that he showed her. *Id.* He asked her to shower in the master bathroom and touched her crotch with his hand afterwards. *Id.* He also asked her to wash him as he took a bath. *Id.* He touched her vagina with his penis, but she did not let him put it inside of her vagina. *Id.* He touched her with his hands and mouth and had the victim touch him with her hands, crotch, and mouth. *Id.* Incidents of abuse also occurred in the living room and in a Wal-Mart parking lot. *Id.* He used vibrators on her. *Id.* Her younger brother nearly caught Leek in the act of showing the victim pornography, but Leek closed the laptop and told her younger brother to go outside. *Id.*

According to her testimony, the victim was hesitant to report the sexual abuse because she believed that "something bad would happen, like [she] wouldn't be able to undo it." *Id.* When she told her mother about it in California, she was disappointed that her mother did not contact the authorities and understood that her mother could not do anything to stop the abuse. *Id.* Leek gave her money, chocolate, and underwear as gifts. *Id.* He would express regret after the sexual abuse but do it again the next day. *Id.* He did not like when she would ask him to stop. *Id.* When she reminded him that he was married to her mother, he either became angry or agreed with her. *Id.* On cross-examination, the

15

victim acknowledged that she had contact with authorities due to incidents with her older sister but that she did not report the abuse to them. *Id.* at 204-12.

The victim's younger brother testified that the door was usually locked when Leek and the victim were in the master bedroom together. *Id.* at 215-22. On one occasion, he saw the victim sitting face-to-face and on top of Leek in his bed, and she told him that she was searching from the remote control for the television. *Id.* He also saw a "girl in a bed" on her cellphone when she dropped it as she was making Leek's bed. *Id.* Leek treated the victim as the favorite and gave her gifts and money that he did not give him and the older brother. *Id.* Leek often asked the brothers to go outside and locked the doors to the house. *Id.* The victim's older brother similarly testified that he saw Leek and the victim watch videos with "naked girls"; that Leek asked them to go outside and locked the doors; and that Leek treated the victim as the favorite. *Id.* at 226-30.

The prosecution also presented a supervisor from a child advocacy center to testify as an expert on interviewing children about physical and sexual abuse. *Id.* at 238-53. She testified that there is almost always a delayed disclosure when children experience sexual abuse from a family member. *Id.* Particularly with older children, anxiety about the consequences of reporting the abuse, such as splitting the family, can also cause a delay. *Id.* Children may test receptiveness to a report by disclosing portions of the abuse. *Id.* Child victims are often told to keep the sexual abuse secret and threatened with consequences by parents. *Id.* Given this conundrum, children may attempt to tolerate or accommodate the

abuse. *Id.* They may also feel personally responsible for keeping the family together. *Id.* These same concerns may also cause a child to recant prior reports of sexual abuse or to deny it when prompted. *Id.* Children subjected to abuse on multiple occasions are not likely to be able to recall every instance of abuse but may recall the first instance, the most recent instance, and other particularly notable instances. *Id.*

As witnesses for the defense, trial counsel called Leek's mother and sister, who testified that they did not see any unusual interactions between Leek and the victim. *Id.* at 263-74. Leek also testified at trial. *Id.* at 274-99. He explained that he gave the children money to use at Wal-Mart and that the victim chose the underwear for herself. *Id.* He denied engaging in oral sex with the victim or fondling or touching her in a sexual manner. *Id.* On cross-examination, he explained that the promise to the mother referenced in the audio recording concerned his pornography habit. *Id.* at 299-314. He did not remember the conversation captured by the audio recording and could not elaborate on his references to the victim's "hold" on him, her grabbing his penis, her nudity in the bathroom, and ejaculation. *Id.*

At closing, trial counsel argued that the timing of the victim's accusations suggested that they were the result of manipulation by her mother as she divorced Leek. *Id.* at 339-55. Trial counsel further suggested that the lack of graphic detail in the victim's description of the sexual abuse undermined the credibility of her testimony. *Id.*

On direct appeal, Leek challenged the evidence admitted under Ind. R. Evid. 404(b), arguing that it was used solely for the purpose of demonstrating his propensity to commit crimes and that the prejudicial effect of the evidence was overwhelming as it involved Leek's violent behavior, efforts to evade law enforcement, and his abuse of another child. ECF 14-5. The Indiana Court of Appeals found that Leek had waived this argument by failing to raise the objection at trial and considered whether the admission of the evidence amounted to fundamental error -- "an error that made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm." ECF 14-7. The appellate court rejected the argument, finding that the evidence was offered to show why the victim had been reluctant to report the sexual abuse. *Id.*

At the post-conviction stage, Leek argued that trial counsel provided ineffective assistance by failing to object to the evidence under Ind. R. Evid. 404(b) and under the drumbeat repetition rule. ECF 14-13. On appeal, the Indiana Court of Appeals rejected this argument, finding that an objection under Ind. R. Evid. 404(b) would not have been sustained. ECF 14-15. According to the appellate court, the evidence was necessary to rebut Leek's defense, which focused on portraying the victim and her older sister as unreliable witnesses who used complaints to authorities to control Leek, the parent who served as their primary disciplinarian. *Id.*

The appellate court also rejected the argument that the number of witnesses presented to illustrate the victim's family history violated the rule against drumbeat repetition. *Id.* The appellate court reasoned that that rule applied to the repetition of a victim's out-of-court statements rather than testimony that merely corroborated the victim's narrative and that none of the five witnesses who preceded the victim on the witness stand had rearticulated the victim's statements during their testimony. *Id.* Further, the appellate court found that Leek could not demonstrate prejudice due to the overwhelming evidence of his guilt, which included the victim's testimony regarding the sexual abuse, the family's testimony regarding suspicious behavior that corroborated the victim's narrative, and the audio recording of the conversation between Leek and the mother. *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination on these claims. The trial court twice denied trial counsel's objection at pretrial hearings, and the appellate court found that the objection under Ind. R. Evid. 404(b) would not have been sustained under Indiana law. The State courts similarly found that an objection under the drumbeat repetition rule would not have been sustained. In other words, these objections would have been futile, and the failure to make futile objections is insufficient to demonstrate a claim of ineffective assistance of trial counsel. *See e.g., Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015) ("His performance was not deficient by failing to make a futile objection."); *U.S. v. Neeley*, 189 F.3d 670, 684

(7th Cir. 1999) ("Obviously, counsel cannot be considered ineffective for failing to make an objection to the introduction of evidence that was properly admitted."). Leek asks the court to reevaluate the State court findings regarding the futility of the evidentiary objections, but "[b]ecause that conclusion rests on an interpretation of state law, it is iron-clad on habeas review." *Washington v. Boughton*, 884 F.3d 692, 701 (7th Cir. 2018); *see also Sennholz v. Strahota*, 722 Fed. Appx. 569 (7th Cir. 2018) ("That is a determination of state law by the state court and therefore is not subject to our review."); *Harper v. Brown*, 865 F.3d 857 (7th Cir. 2017) ("[O]n § 2254 habeas review, we cannot disagree with a state court's resolution of an issue of state law."); *Miller v. Zatecky*, 820 F.3d 275 (7th Cir. 2016) ("A federal court cannot disagree with a state court's resolution of an issue of state law"); *Earls v. McCaughtry*, 379 F.3d 489 (7th Cir. 2004) ("[B]ecause it is not our place to second-guess state courts in interpreting state law we must find that the State court did not make an unreasonable application of *Strickland* when it found counsel's failure to object to testimony.").

The State court's determination that Leek did not demonstrate prejudice due to the overwhelming nature of the evidence was also not unreasonable. Though the testimonial evidence was fairly strong, it is conceivable that Leek may have been able to persuade the jury that the victim was not credible and may have been able to persuade the jury that the other family members had misinterpreted their personal observations of the interactions between Leek and the victim. However, it is unclear how Leek could have persuaded the jury to

20

disregard the audio recording of the conversation between himself and the mother. The audio recording also included several instances where he declined to unequivocally deny that he engaged in sexual activity with the victim. Leek also acknowledged that the victim touched his penis, that he was "weak" and she had "a hold" of him, that she might have been naked in his bathroom, and that he did not want to get her in trouble because he was "the one who started this bullshit." The recording included Leek's disturbing remark that he would not "replace a thirteen-year-old with [his] wife" because "[t]he connection there is not the same." When asked to explain these comments, Leek merely represented that he did not remember the conversation despite personally participating in the conversation and hearing the audio recording played at trial with access to the transcript of recording and knowledge of the prosecution's reliance on the recorded conversation in the criminal case against him. Given the futility of objections and the highly incriminating nature of the audio recording, the claim that trial counsel's failure to object to the evidence regarding the victim's family history is not a basis for habeas relief.

Excessive Sentence

Leek argues that he is entitled to habeas relief because the trial court did not properly consider aggravating and mitigating factors at sentencing. At sentencing, the trial court considered the absence of a criminal record as a mitigating factor and the nature and circumstances of the crime and the violation of a position of trust as aggravating factors. Sentencing Tr. 19-22. On direct appeal, Leek challenged his

sentence only under State law, and the Indiana Court of Appeals affirmed the sentencing decision, agreeing with the trial court's identification and balancing of the aggravating and mitigating factors in their entirety. ECF 14-5; ECF 14-7. Because Leek challenged his sentence only under State law, he cannot obtain habeas relief on this claim because it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

<u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Leek to proceed further.

For these reasons, the court DENIES the habeas corpus petition (ECF 2); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on November 22, 2021

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT